# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | |
|---|---|
| **WILLIAM R. STONE,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **No. 2:09 CV 232** |
| | ) |
| **LEVIN TIRE CENTERS OF** | ) |
| **CROWN POINT, INC.,** | ) |
| **Defendant.** | ) |

## OPINION and ORDER

Plaintiff William R. Stone ("Stone") filed a complaint against defendant Levin Tire Centers of Crown Point, Inc. ("Levin") claiming that it terminated his employment on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"). Levin filed a motion for summary judgment (DE # 12), Stone filed a response (DE # 17), and Levin filed a reply. (DE # 22.)

To begin, the court will briefly address Levin's motion for a summary ruling on its motion for summary judgment. (DE # 14.) Stone's response was due on March 25, 2011, and he had not filed it by the time Levin moved for a summary ruling on April 4, 2011. (*Id*.) In response, Stone's attorney filed a motion to extend the time to file a response explaining that he had intended to file a similar motion before the deadline expired, but his office filed it incorrectly. (DE # 15.) Levin did not object to extending the time to file the response and the motion was granted. (*Id*.; DE # 16.) Therefore, the motion for summary ruling will be denied.

# I.    FACTUAL BACKGROUND

The facts in this summary are either undisputed, or, when in dispute, resolved in favor of the non-moving party, Stone. *See Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). The court has included some facts as Levin sees them in order to explain the parties' dispute.

### A.    *Stone's Employment at Levin*

Stone, born on June 20, 1950, began working at Levin in the early 1980s as a tire technician. (Stone Aff. ¶¶ 1-2.) In the mid-1980s Levin sent him to two weeks of training to become an alignment technician. (*Id.* ¶ 2.) The only other formal training that he received from Levin was for heating and air conditioner repair. (*Id.*) Apart from a stint as a service manager, he was an alignment technician for the twenty-eight years that he worked at Levin. (*Id.* ¶ 4.) Until 2008, Stone did not receive any complaints about his job performance except for a written reprimand in 2000. (Stone Aff. ¶¶ 5, 6, Pl.'s Exh. 1, DE # 17-1.) His former managers, Larry Edmonds ("Edmonds") and Kevin Jones ("Jones") told him that his work performance was good.[1] (*Id.*) In recognition of the quality of his work, Stone received a watch at a company Christmas party. (*Id.* ¶ 6.) According to Stone, Levin's Employee Handbook required annual performance

---

[1] Stone points to his own affidavit for this evidence; he has not procured an affidavit or deposition testimony from Edmonds or Jones. He also does not provide a time frame for these comments or for the presentation of the watch.

reviews.[2] (*Id.* ¶ 5.) Levin had a policy of giving written reprimands for poor performance. (*Id.* ¶ 6.) Stone received a written reprimand from Jones in 2000 for what he describes as a "relatively minor incident." (*Id.*) The reprimand described what happened and he signed the reprimand to verify that Jones had discussed it with him. (*Id.*) This is the only written reprimand that Stone received while working at Levin. (*Id.*)

As of January 2, 2008, Stone was paid $21 an hour by Levin. (Stone Aff. ¶ 7.) Stone states that Edmonds told him that his pay would be reduced to $17 an hour because he could not perform diagnostics or major engine repair. (*Id.*) Edmonds only told Stone that he did not have training to justify the higher rate, not that his work was inadequate. (*Id.*) Jeffrey Russell ("Russell"), Levin's General Manager, was solely responsible for reducing Stone's hourly pay. (Russell Dep. 4, 25, Def.'s Exh. 2, DE # 12-2.) He stated that Stone's pay was reduced because "the work that he was doing at the rate that he was being paid, he was not able to do at the level of ability that was required by" Levin. (*Id.* at 25.)

Russell stated that Stone was responsible for "come-backs," referring to instances in which customers had to return with their cars when the initial repair work was substandard and/or not completed correctly. (*Id.* at 10.) He did not know how many come-backs Stone was responsible for. (*Id.*) He said that come-backs would be documented in Stone's personnel file if it was documented at all. (*Id.* at 10, 16.) Store

---

[2] Again, Stone relies only on his own affidavit to support this assertion. He has not provided the court with a copy of the handbook.

manager Cheryl Tomes ("Tomes") stated that there was not a document that reflected the number of come-backs related to Stone's work. (Tomes Dep. 11, Def.'s Exh. 3, DE # 12-3.) Russell stated that apart from the come-backs, there were not other indicators of substandard work by Stone. (*Id.* at 10.) However, he also stated that Stone was not performing suspension, brake, and alignment work correctly. (*Id.* at 16.)

Russell was not at the Crown Point store on a daily basis so he relied on input from store managers or other supervisors when making personnel decisions. Russell was not sure if Tomes, who was the assistant store manager at that time, or Edmonds gave him information about Stone's work performance for his decision to reduce Stone's pay. (*Id.* at 26.) Tomes stated that she had no involvement in the decision to reduce Stone's pay. (*Id.* at 18.) Stone stated that after his pay was reduced, he made sure that his job performance and attendance were excellent so that Levin would not have a reason to terminate him. (*Id.* ¶ 8.)

In March 2008, Edmonds went on family medical leave and Tomes was promoted from assistant store manager to store manager. (Stone Aff. ¶ 9.) Prior to that time, Stone did almost only alignment work. (*Id.*) As store manager, Tomes asked Stone to do brake work and other repair work for which he had not been given training by Levin. (*Id.*) As discussed more fully below, Tomes did not offer Stone training in the other areas that she asked him to do work in. (*Id.*) Stone states that Tomes never complained about his work or even said anything slightly critical about it and he did not know that she had any concerns about it until his termination. (*Id.* ¶¶ 10, 11.)

Levin terminated Stone's employment with it on June 20, 2008, on his fifty-eighth birthday. (Stone Aff. ¶ 12.) The decision to terminate Stone was made by Russell, Levin's Human Resources Director, Jennifer Rogalski ("Rogalski"), and Tomes. (Russell Dep. 36.) Russell stated that they discussed the issues that Stone was having with come-backs and that there were a few jobs that Stone could not repair after several opportunities to do so. (*Id.* at 40.) He stated that performance issues and come-backs had been a problem during Stone's last ten years with Levin. (*Id.*) Tomes stated that she could not remember having any discussions with Russell about Stone's job performance between his pay reduction and his termination. (Tomes Dep. 29.) She was not involved in any conversations leading up to the decision to terminate Stone. (*Id.* at 30.) Russell called Tomes and told her that Levin would be terminating Stone because of his "lack of skill level and . . . substandard work performance." (*Id.*) Tomes told Russell that she agreed with this decision. (*Id.*) Rogalski stated that Russell informed her and Tomes that Stone was being terminated because of his poor work performance. (Rogalski Aff. ¶ 11, Def.'s Exh. 1, DE # 12-1.) Mr Stone's age was not mentioned during that discussion. (*Id.* ¶ 12.)

On June 20, 2008, Tomes called Stone into her office and, in Rogalski's presence, told him that his employment was terminated. (Stone Aff. ¶ 12.) When Stone asked why, Tomes said that he had obviously been unhappy since his wages were cut. (*Id.*) Rogalski said that Stone had some come-backs. (*Id.* ¶ 13.) She stated that she had

documentation of the come-backs, but she did not show anything to Stone and she did not discuss any details of the come-backs. (*Id.*)

Tomes said that Stone had performance issues due to his skill level and that there was certain work he could not do that Levin needed him to be able to do. (Tomes Dep. 10.) She said that he would have come-backs on strut and brake work and could only do alignments well. (*Id.* at 10-11.) She stated that technicians needed a wide range of skills because they were responsible for any automotive problem brought in by a customer. (Tomes Aff. ¶ 6, DE # 12-4.) In Tomes's estimation, Stone possessed a limited skill set, could not perform all of the jobs needed for his position, was not as efficient as many of the other technicians, and was showing an increased error rate. (*Id.* ¶¶ 7, 10, 16.) She stated that other technicians could perform more repairs in a week than Stone. (*Id.* ¶ 16.)

Tomes stated that customers would routinely come back with problems after Stone had repaired their cars. (*Id.* ¶ 19.) During her deposition on September 15, 2010, Tomes could not remember the number of come-backs related to Stone's performance or doing a performance review with Stone. (Tomes Dep. at 13.) She stated that there was no documentation to show how many come-backs Stone had. (*Id.* at 11.) As discussed more fully below, Tomes stated in an affidavit, dated five months after her deposition, that she found a document in Stone's personnel file in which she had recorded three come-backs related to Stone's work that took place in June and March of 2008. (Tomes Aff. ¶ 11.)

According to Stone, come-backs happened frequently at the Crown Point center and "everyone" had some. (Stone Aff. ¶ 13.) He stated that when there was a problem with a come-back, management would issue a written reprimand which the employee would have to sign. (*Id.* ¶ 14.) If the repairs done to the vehicle were deficient, Levin would charge back the employee for the work done on the repair and the money would be deducted from the next paycheck. (*Id.*) Stone stated that he did not have either a written reprimand for a come-back or a charge-back during his twenty-eight years at Levin. (*Id.*) Stone stated that he could only remember one Levin employee who was terminated for having too many come-backs and that person had an overall persistently poor work performance. (*Id.*)

Before Levin's motion for summary judgment was filed, Stone had not seen the come-back memo attached to Tomes's affidavit. (Stone Aff. ¶ 15.) He stated that these incidents had never been discussed with him. (*Id.*) Stone recalls two of the come-backs listed in the memo that occurred in June, 2008. (*Id.* ¶ 16, 17; Exh. A. to Tomes Aff., DE # 12-4 at 3.) The first come-back involved a car, owned by Stone's friend, with a broken motor mount. (Stone Aff. ¶ 16.) The motor mount was missing a bolt, and Stone was not sure how to replace it without the bolt. (*Id.*) He admits that he made a mistake, but states that it was easily corrected and no one at Levin had made an issue of it. (*Id.*) The second come-back involved a twenty-year-old pick-up truck that was in terrible shape. (*Id.* ¶ 17.) The brake lines were rusted, the calipers were seized, the rubber brake houses were deteriorated, and the master cylinder needed to be replaced. (*Id.*) Stone

told Tomes that Levin should not accept the job because the truck was in such bad shape, but she told him to proceed with the job. (*Id.*) Other technicians also worked on the truck, and another technician, Jose Munoz, installed the master cylinder that needed replacement after the come-back. (*Id.*) Stone thought that there might be a problem with the job because of the poor beginning condition of the truck, and he had Edmonds check the job before the truck was given to its owner. (*Id.*)

Tomes stated that she talked to Stone about his job performance during weekly shop meetings. (Tomes Dep. at 12.) She did not provide any specifics about what was discussed or how often Stone's work was discussed. Tomes could not remember if she had filled out a disciplinary form for Stone. (*Id.* at 12.) She could not remember doing a performance review with Stone. (*Id.* at 13.) She stated that she never had a one-on-one discussion with Stone about his work performance and the only time she criticized his work was during the shop meetings. (*Id.*) Tomes also stated that she remembered charging Stone back for substandard work. (*Id.* at 12-13.) When asked how many times he was charged back, she said: "I have no idea. I can't tell you positively." (*Id.* at 13.) She stated that charge-backs were documented in the customers' histories. (*Id.*)

B.    *Training at Levin*

During his last ten years at Levin, Stone was not offered any advanced training opportunities, but his younger co-workers were. (Stone Aff. ¶ 7.) As mentioned above, when Tomes became store manager in March, 2008, she asked Stone to perform work in

areas beyond alignment. (Stone Aff. ¶ 9.) Stone was not offered training in these areas while his younger coworkers were. (*Id.*)

When technicians needed to be qualified in certain types of repairs, they were sent to training on that topic (Tomes Dep. 16.) Technicians were required to undergo a lot of training. (*Id.* at 17.) Levin's Human Resources Department, not the store managers, would decide what training the technicians should take and schedule the training sessions for the technicians. (Tomes Dep. 17-18.) Tomes stated that Stone went to some of the training sessions, but she could not remember how many. (Tomes Dep. 18.) However, Russell stated that Stone was not offered advanced training because "he couldn't perform the services that he was given at the quality level that was acceptable to Levin Tire." (Russell Dep. 16.) These services included alignment, brakes, and some suspension. (*Id.*)

C.    *Comments about Stone's age*

Stone stated that Tomes and other coworkers referred to him as "The Old Man," but he did not complain to upper management about it because he did not think it was "worth making an issue of it." (Stone Aff. ¶ 10.)

D.    *Stone's replacement*

The workforce at the Crown Point location was reduced from four technicians to three technicians for some months. (Tomes Dep. 22.) Stone was replaced by Tom Kokos ("Kokos"), a man in his mid twenties who was the tire technician until Stone's termination when he became the alignment technician. (Stone Aff. ¶ 19.) Stone heard

Russell say that he had "big plans" for Kokos. (*Id.*) Russell stated that Kokos did not take Stone's place after Stone was terminated. (Russell Dep. 41.)

E.    *The parties' arguments*

Levin argues that it should be granted summary judgment because Stone cannot make a prima facie case of age discrimination or prove pretext for either his wage reduction or his termination. It argues that Stone does not have a claim of age discrimination based on its reduction of his wages because Stone failed to meet its legitimate performance expectations because he had a higher error rate, a narrower skill set, and more come-backs than other technicians at the Crown Point location. (DE # 13 at 6.) It also argues that Stone cannot show that its stated reason for firing him was pretextual. (*Id.* at 7.) Similarly, Levin argues that Stone cannot show that he was fired because of his age for the same two reasons and for the additional reason that it did not seek a worker with the same qualifications to replace him. (*Id.* at 8.)

In response, Stone concedes that he cannot proceed under the direct method, so he focuses only on the indirect method for proving a violation of the ADEA. (DE # 17 at 6.) He argues that he was performing up to Levin's expectations because no manager talked to him about poor performance, he did not receive written reprimands, he was not charged back for repairs, and he was praised by former managers. (*Id.* at 8.) He contends that Levin's stated reason for firing him, his limited skill set including his inability to do brake and strut work well, was pretextual because Levin provided training for other technicians to develop a broader skill set, but it did not offer the same

opportunity to him. He also argues that he was replaced by a younger technician, Kokos. (*Id.* at 7.) In its reply, Levin argues that because Stone admits he had a limited skill set and that customers returned with complaints about work he had completed he cannot show that Levin was lying when it fired him on this basis. (DE # 22 at 2.)

## II.     STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" those materials listed in RULE 56(c) which "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmovant may not rest upon mere allegations. Instead, "[t]o successfully oppose a motion for summary judgment, the nonmoving party must come forward with specific facts demonstrating that there is a genuine issue for trial." *Trask-Morton*, 534 F.3d at 677. "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). Furthermore, when evaluating a motion for summary judgment, the court views the record and makes all reasonable inferences in a light most favorable to the nonmovant. *Popovits,* 185 F.3d at 731. If the nonmovant cannot establish an essential element of his

claim, RULE 56(a) requires entry of summary judgment for that claim. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex*, 477 U.S. at 322-23).

## III.   ANALYSIS

A plaintiff attempting to prove a violation of the ADEA may proceed using either a direct or an indirect method of proof. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Using the indirect, or "burden-shifting," method, a plaintiff establishes a prima facie case of discrimination with evidence of: 1) membership in a protected class; 2) job performance meeting the employer's legitimate expectations; 3) an adverse employment action; and 4) in a termination case, as here, that the employer sought someone else to perform the same work. *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007). Once such a showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* at 364-65. If the employer does so, then the burden shifts back to the plaintiff to offer evidence suggesting that the proffered explanation is a pretext for discrimination. *Id.* at 365.

Stone focuses his response almost entirely on his termination and barely discusses his reduction in wages. For Stone's claim for termination in violation of the ADEA, there is no question that the first and third prongs of a prima facie case were met - Stone was member of a protected class and he suffered the adverse employment action of termination. There is a genuine factual dispute as to the fourth prong, whether Levin sought someone else to perform the same work. Stone points to his own affidavit to prove that a younger employee, Kokos, was moved into his position. Levin argues

that for a period of months, no additional automotive technician was hired into Stone's position. (DE # 13 at 9.) Another technician was eventually hired, but Levin argues that it did not seek to replace Stone with a technician with the same skill set as him because the other technicians had "greater skill sets than Stone." (*Id.*)

However, the court is not convinced that the inquiry into the same qualifications need be so exacting. In *McDonnell Douglas Corp. v. Green*, the Supreme Court found that the plaintiff had met this requirement because he was a mechanic and the employer continued to seek mechanics after it failed to re-hire him. 411 U.S. 792, 802 (1973). Similarly, in the context of determining whether employees are similarly situated, it is well established the employers cannot avoid liability by simply giving each employee a different job title. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000). Here, Levin only asserts, without pointing to any evidence, that the additionally-hired technician did not have the same skill set as Stone. It does not show how the qualifications were different. Therefore, viewing the evidence in the light most favorably to Stone, the court will assume that this element of a prima facie case has been satisfied.

The parties disagree about whether there is a genuine factual dispute about Stone meeting Levin's legitimate employment expectations. To prove that he was meeting them, Stone relies only on his own affidavit. In some cases an employee's testimony of the quality of her own work can be enough to meet the second prong of plaintiff's prima facie case, *Oates v. Discovery Zone*, 116 F.3d 1161, 1171-72 (7th Cir. 1997); *Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 923 n.6 (7th Cir. 1988), but in many cases a plaintiff's

self-serving appraisals are not enough to create a genuine issue of fact, especially in the context of determining pretext. *Id.* at 924; *Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008) (citations omitted); *Nichols,* 510 F.3d at 784 ("We have repeatedly stated . . . that plaintiffs must offer more than mere self-serving appraisals.") Here, Stone only asserts that other managers praised his work, that Russell decided to terminate him without input from his direct supervisors, and that Levin did not document his poor performance. (DE # 17 at 8.) None of these contentions show that he was meeting Levin's legitimate performance expectations. But even if the court accepts Stone's assertion that his performance was good (Stone Aff. ¶ 5), he is ill-equipped for clearing the hurdle of showing that Levin's proffered reason for terminating him was pretext for discrimination as Stone's self-appraisals do little to show that Levin lied when it evaluated him differently. *See Williams*, 856 F.2d at 924.

Levin states that it terminated Stone because he did not possess all of the skills needed for his position, he was inefficient, and he was committing errors and performing substandard work resulting in costumer complaints. (DE # 13 at 8-9.) A plaintiff can demonstrate that an employer's explanation is pretextual by showing that "the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent." *Hobbs v. City of Chi.*, 573 F.3d 454, 462 (7th Cir. 2009). In determining pretext, the plaintiff cannot just show that the action was taken for "incorrect or poorly considered reasons;" she must "establish that the employer did not honestly believe the reasons it gave for terminating" her. *Pitasi v. Gartner Group, Inc.,*

184 F.3d 709, 718 (7th Cir. 1999). To do so, the plaintiff "must *specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere,* 83 F.3d 833, 845 (7th Cir. 1996) (citing *Collier v. Budd Co.,* 66 F.3d 886, 893 (7th Cir. 1995)) (emphasis in *Mills*). Plaintiffs can "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence." *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 541 (7th Cir. 2007). When a defendant offers several non-discriminatory reasons for its decision, the plaintiff cannot just show that one of the reasons was pretextual. *Fischer v. Avanade, Inc.,* 519 F.3d 393, 403-04 (7th Cir. 2008). The exception to this is when the reasons are so intertwined or the pretextual character of one of them is so "fishy and suspicious" that summary judgment may still be unwarranted. *Id.*

Stone's position that Levin's stated reason for firing him was pretext for discrimination is based on three main points: 1) Levin stated that it terminated him because of his limited skill set, but it did not give him the training to broaden his skill set; 2) Russell made the decision to terminate Stone without any input from Stone's direct supervisors; and 3) the document that lists Stone's come-backs appears to have been created after litigation began and not in 2008 as Levin claims. (DE # 17 at 8.)

First, there is authority for the idea that a claim of age discrimination can be based on "failure to train" when the employer encourages younger, but not older workers, to seek training that advances their skills and job prospects. *See Testerman v. EDS Technical Prods. Corp.*, No. IP 94-365, 1995 WL 904816 (S.D. Ind. Dec. 27, 1995).

However, Stone does not argue that he can build a prima facie case of age

discrimination based on failure to train.[3]

Instead, he argues that Levin's statement that it fired him because he did not

have an expansive skill set was a lie fabricated after his termination because Levin

provided younger workers with training to expand their skills but failed to offer the

same training opportunities to him. (DE # 17 at 8.) He argues that he was trained as a

wheel technician and was not expected to do other work during most of his twenty-

eight years with Levin. The court can understand how Stone may feel that it was unfair

that he was asked to perform tasks beyond alignment without the opportunity for

renewed training. However, the court cannot be concerned with "whether the decision

---

[3] Because Stone did not argue that he had an ADEA claim for failure to train in his response to the motion for summary judgment, he has waived that claim. *See Filippo v. Lee Publ'ns., Inc.,* 485 F. Supp. 2d 969, 972-73 (N.D. Ind. 2007); *White v. Gerardot,* No. 1:05-CV-382, 2007 WL 541819, at *4 (N.D. Ind. Feb. 15, 2007); *Palmer v. Marion County,* 327 F.3d 588, 597-99 (7th Cir. 2003).

The elements of a prima facie case of discrimination based on an employer's failure to train an employee are: 1) plaintiff belongs to a protected group, 2) his employer provided training to its employees, 3) he was eligible for that training, and 4) he was denied training that was given to other similarly situated employees outside of the protected group. *Pafford v. Herman,* 148 F.3d 658, 667 (7th Cir. 1997), *cert. denied,* 525 U.S. 1020 (1998). Stone has not offered specific evidence to show that he was eligible for the training provided by Levin or that similarly situated younger employees were given certain training while he was not. Stone's only evidence on this issue is his assertion that younger employees received more training than he did, and this is insufficient to raise an inference of discrimination. *See e.g., id.* at 668. Also, while Stone argues that he was not provided with further training, he does not present evidence that he asked for additional training and was denied that opportunity. So even if Stone had argued that he had a claim based on failure to train, there is not evidence to support a prima facie case of discrimination on that basis. *See e.g., Walker v. Mitsubishi Motor Mfg. of Am., Inc.,* 113 Fed. App'x 711, 713 (7th Cir. Oct. 15, 2004) (unpublished); *Garcia v. TA Operating LLC,* No. 09-cv-1018, 2011 U.S. Dist. LEXIS 3507, 26-28 (S.D. Ill. Jan. 12, 2011).

was right or wrong, fair or unfair, well-considered or precipitous." *Beatty v. Wood*, 204 F.3d 713, 718 (7th Cir. 2000) (quoting *O'Connor v. DePaul Univ.*, 123 F.3d 665, 670 (7th Cir. 1997)). Instead, the court is restricted to evaluating whether the given reason "actually did underlie the plaintiff's termination." *Id.*; *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697-98 (7th Cir. 2006) ("Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair.")

Stone has not shown that Levin lied when it claimed that one of the reasons it terminated him was his limited skill set. As explained in the footnote below, Stone has not presented any specific evidence of the training given to other employees. When Stone's pay was reduced in January, 2008, he was told that the reduction was due to his limited skill set. He was also asked to perform work beyond alignment after March, 2008. However, he has not produced any evidence that he asked for training or otherwise attempted to expand his skill set. Further, Levin has produced evidence in justification of its decision not to provide expanded training to Stone. Russell stated that Stone was not offered advanced training because "he couldn't perform the services that he was given," including alignment, brake and suspension work, "at the quality level that was acceptable to Levin Tire." (Russell Dep. 16.) Accordingly, Russell did not feel that Stone was performing quality work in his existing skill areas, explaining Levin's reasoning for not giving him training in additional areas. Stone also confirms that he

had two come-backs on this work. Therefore, Levin's failure to provide expanded training to Stone does not cast doubt on its proffered reasons for his termination.

Second, Stone is not able to create an issue of material fact as to pretext by arguing that Russell made the decision on his own. In *Williams*, the Seventh Circuit determined that a plaintiff's evidence that the decision-makers did not observe her work may have evinced poor business judgment, but it did not raise sufficient doubt "about the genuineness and honesty of the employer's layoff decision making process." *Williams*, 856 F.2d at 924. Here, Russell stated that he based his decision on information he obtained from Stone's direct supervisors and Tomes's deposition and affidavit testimony align with Russell's evaluation of Stone's work.

Third, Stone's argument that the document listing come-backs on his work was fabricated for this litigation, may have some merit. At her deposition on September 15, 2010, Tomes was questioned about the type of documentation that existed on come-backs:

> Q.  How many come-backs did [Stone] have during the time that you were store manager?
>
> A.  Honestly, I can't say. I don't have like a document for me to tell you that.
>
> Q.  Are there some documents that you could find to say how many come backs there were?
>
> A.  No. Because like I told you before, it's for the customer when they would come into the door. I would have to remember every customer.
>
> Q.  But I thought you said when there was a come back, that a form was created?
>
> A.  No. I said like if you were the customer, we would open a ticket . . ..

(Tomes Dep. 11.) Accordingly, Tomes was directly asked if there was a document showing the number of come-backs. She replied that there was not. Tomes then submitted an affidavit signed February 25, 2011 stating that she reviewed Stone's personnel file and found a document she created "sometime in 2008" that recorded come-backs for Stone's work. (Tomes Aff. ¶ 11.) The affidavit gives the specifics of the three come-backs listed in the document attached to the affidavit. (*Id.* ¶¶ 12-14.)

An "affidavit cannot be used to create a genuine issue of material fact where the affidavit differs from the prior deposition testimony to the point that it is unreliable." *Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719, 720 (7th Cir. 1998); *Russell v. Acme-Evans Co.,* 51 F.3d 64, 67 (7th Cir. 1995) (stating that the Seventh Circuit has "been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit"). While the court sincerely hopes that this document was not created after litigation began, it cannot accept the document as authentic at the summary judgment stage. The Seventh Circuit has advised: "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Id.* at 68. There is no indication in the record that the question at the deposition was unclear or that Tomes had a lapse of memory. Therefore, the court will disregard the attachment to Tomes's affidavit and her affidavit testimony about it.

Still, Stone himself has provided testimony about the two come-backs in June, 2008. Therefore while there is some disturbing indication that the document was fabricated, it appears that at least two of the come-backs it lists did occur. Therefore, Stone does not have evidence to show that Levin lied when it said that he had come-backs prior to his termination.

Finally, none of the other evidence that Stone points to shows that Levin's stated reasons for firing him were pretextual. Stone has presented evidence that Tomes referred to him as "the old man." If Tomes was not the person who made the decision to terminate Stone, these comments are irrelevant. *Maarouf v. Walker Mfg. Co., Div. of Tenneco Automotive, Inc.*, 210 F.3d 750, 754 (7th Cir. 2000). The record shows that Russell made the decision to terminate Stone, but Russell also stated that because he did not work at the Crown Point center on a daily basis, his perception of employees was based on input from the store managers, including Tomes. If Russell's perception of Stone's work was based on Tomes's input, then her comments may be relevant. *Id.* Even so, Tomes's referral to Stone as "the old man" does not show that she had a discriminatory animus towards old people. These comments appear to be unrelated to Stone's termination and therefore do not show that the proffered reason was pretextual. *See e.g., Ptasznik*, 464 F.3d at 696-97; *Weisbrot v. Med. Coll. of Wis.*, 79 F.3d 677, 684-85 (7th Cir. 1996) (stating that the decision-maker's referral to the plaintiff as an "older lady" was an isolated remark in a positive context and therefore could not show that the employer lied about its reason for firing her); *Koski v. Standex Int'l Corp.*, 307 F.3d 672,

678 (7th Cir. 2002) (finding that vague evidence that the decision-maker made discriminatory statements against older people did not support a finding of pretext because it did not evince a propensity by the decision-maker to evaluate employees based on illegal criteria) (internal quotations omitted). Stone has not shown that Tomes's referral to him as "the old man" was made in a negative context or illustrated a likelihood to fabricate a reason to terminate an older person.

Stone can also not show that Levin's stated reason for firing was pretextual by showing that it did not follow a policy of issuing written reprimands or charging him back for come-backs and he did not receive a negative performance review. Stone presents only his own testimony for proof that Levin had a policy of giving written reprimands for poor performance. While he states that this policy is documented in Levin's employee handbook, he has not provided the court with a copy of this policy. Further, when an employer can point to unrefuted employment deficiencies, a plaintiff cannot create a genuine issue of fact as to pretext by stating that he received positive performance reviews before termination. *See e.g., Bedynek-Stumm,* 234 F.3d at *2. Here, Stone admits that his skill set was focused on alignments. He also admits that he had at least two come-backs. Further, even if he did not receive a negative performance review or a written reprimand, Stone's pay was reduced six months before he was terminated. He was told in January 2008 that his pay reduction was a result of his limited skill set. While he tried to make sure his performance and timeliness were excellent after this

time, he has not presented any evidence that he requested training to expand his skill set or that he attempted to talk to Russell or Tomes about his performance.

Further, Stone has not presented any evidence to refute Tomes's assertion that he was inefficient and that he had an increasing error rate. In fact, as mentioned above, Stone's only evidence that his performance had been satisfactory was his own evaluation of his work and his assertion that everyone, not just him, had come-backs. This is not sufficient to question the legitimacy of Levin's given reasons for terminating Stone. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (stating that the Seventh Circuit has issued "frequent admonitions 'that a plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions'") (citing *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435 (7th Cir. 1996)). Overall, the Seventh Circuit has advised that "'[s]ummary judgment is proper where no rational factfinder could believe that the employer lied about its proffered reasons for' the hiring decision in question." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005) (quoting *Weisbrot*, 79 F.3d at 682). Stone has not presented the court with evidence from which it can find that Levin's proffered reasons for terminating him - inefficiency, at least two come-backs, and his inability to perform the variety of tasks it asked him to - were not its true reasons.

Similarly, Stone's claim of age discrimination based on the reduction in his wages cannot survive summary judgment. To build a prima facie case of disparate

treatment based on the reduction in wages, Stone would have to show that similarly situated employees did not have their wages reduced or were paid a higher wage. *See e.g., Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006). He has not pointed to similarly situated employees who did not have their pay reduced or who made a higher wage than he did after the reduction. Even more, Stone has not refuted Russell's stated reason for reducing his pay and therefore cannot show that it was pretext for discrimination. Russell stated that he reduced Stone's pay because "the work that he was doing at the rate that he was being paid, he was not able to do at the level of ability that was required by" Levin. (*Id.* at 25.) As discussed above, Stone has not presented any evidence that would cast serious doubt on Russell's belief in this statement.

For the foregoing reasons, Levin's motion for summary ruling (DE # 14) is **DENIED**. Levin's motion for summary judgment (DE # 12) is **GRANTED** and the clerk is directed to **ENTER FINAL JUDGMENT** as follows:

> Judgment is entered in favor of defendant Levin Tire Centers of Crown Point, Inc., and against plaintiff William R. Stone, who shall take nothing by way of his complaint.
>
> **SO ORDERED.**

Date: August 24, 2011

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT